## Smith v. Commonwealth.

(Decided June 20, 1913).

## Appeal from Clark Circuit Court.

1. Criminal Law—Appeal—Indictment—Hearing of Other Than Legal Evidence by Grand Jury—Action of Trial Court in Refusing to Set Aside Indictment—Review—Section 281, Criminal Code.—Under section 281, Criminal Code, the action of the trial court in refusing to set aside an indictment on the ground that the grand jury heard other than legal evidence is not subject to exception, and cannot be reviewed on appeal.

2. Criminal Law—Witness—Impeachment—Collateral Issue.—Where on the trial of the defendant for knowingly, feloniously and corruptly swearing that two alleged participants in a murder were in the town of Jackson, 20 miles away from the scene of the murder, a witness for the Commonwealth testifies that the two men were present with him participating in the crime and also a third man, the whereabouts of the third man who participated in the crime was so much a part of the res gestae as to make it a direct and material issue instead of a collateral issue, and the defendant is not concluded by the answer of the Commonwealth's witness, but may show by other witnesses that the third party was

as a matter of fact, not present at the scene of the crime, for the purpose of impeaching the Commonwealth's witness. .

3. Criminal Law—Witness—Interrogation by Court.—Although the trial court may interrogate a witness for the purpose of ascertaining the truth and bringing before the jury the real facts of the case, where there is nothing in the question or the manner of the interrogation from which the court's opinion of the facts or the weight of the evidence can be gathered, yet it. is prejudicial error for the court to examine the witness in reference to a conversation he had with the court in such a manner as to make the court itself an impeaching witness.

4. Criminal Law—Evidence—Rebuttal.—The trial court has a reasonable discretion in admitting testimony in chief by rebuttal witnesses, and it is only in rare instances that a reversal will be decreed because of the court's action in receiving evidence in rebuttal which should have been adduced in chief.

BEVERLY R. JOUETT, J. SMITH HAYS, J. SMITH HAYS, JR., W. B. LINDSEY, H. H. MOORE and T. P. COPE for appellant.

JAMES GARNETT, Attorney General, and CHAS. H. MORRIS, Assistant Attorney General for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

On May 4, 1912, Ed Callahan, former sheriff of Breathitt county, was assassinated while standing at the window of his store house at Crockettsville, a small town about twenty miles from Jackson. The shots which killed him were fired from a woodland on the side of a mountain about 157 yards distant. At the September term of the Breathitt Circuit Court, the grand jury of that county returned indictments against D. F. Deaton, Doc Smith, Andrew Johnson and several others charging them with the commission of the crime. On motion of the Commonwealth, a change of venue was granted, and the cases were transferred in October, 1912, to the Clark Circuit Court. The defendants made a motion for bail. The trial of this motion consumed several days. On the completion of the trial, D. F. Deaton, Govan Smith and several others were admitted to bail. Five of the defendants, to-wit: John Claire, Andrew Johnson, Doc Smith, Asbury McIntosh and Jim Deaton were held without bail. D. F. Deaton was the first defendant to be tried. His trial was begun on December 30, 1912, and resulted in a hung jury. Immediately thereafter Doc Smith and Andrew Johnson were jointly tried. Their trial also resulted in a hung jury. On the trial of

D. F. Deaton, the main issue was whether Deaton, Doc Smith and Andrew Johnson, who, it is claimed, were acting in concert with him in the murder of Callahan, were in Jackson on May 4, 1912, at the time of the murder, or in Crockettsville. On that trial M. C. Smith was a witness, and testified that he was in Jackson on the morning of May 4, 1912, and that he saw Doc Smith and Andrew Johnson at about the time the crime was said to have been committed. Several others testified to the same effect. Immediately after the trial of Andrew Johnson and Doc Smith, and on January 18, 1913, the grand jury of Clark County indicted M. C. Smith and about eleven others for the crime of false swearing. The indictment returned against M. C. Smith charges in substance that said Smith, on the 17th day of January, 1913, in the county of Clark, and before the finding of the indictment, after having been sworn by J. M. Benton, judge of the Clark Circuit Court, who was duly authorized by law to administer an oath to testify to the truth, on the trial of the case of the Commonwealth of Kentucky v. D. F. Deaton, on the charge of murder in the Clark Circuit Court, a case then judicially pending in said court, did unlawfully, willfully and feloniously, knowingly and corruptly testify that on May 4, 1912, the day on which Ed Callahan was shot at his store on Longs Creek, in Breathitt County, Kentucky, Doc Smith and Andrew Johnson were in the town of Jackson, Breathitt County, Kentucky, and that he saw them in said town of Jackson on that day, when, in truth and in fact, the said Doc Smith and Andrew Johnson, or either of them, were not in said town of Jackson on the 4th day of May, 1912, and when the said Smith knew he had not seen them or either of them in said town of Jackson, and knew said statements were false and untrue at the time he made said statements. On the back of the indictment are the names of the following witnesses: M. Crain, Jim Little, Adam Stacy, Mrs. Lillian Gross, Mrs. Callahan, Herd McIntosh, Mrs. Anderson, Miss Maxey Samdlin. On January 27, 1913, a special term of the court was called, and convened on March 31, 1913, for the trial of the indictment against defendant, M. C. Smith.

On the calling of the case for trial on April 1st, 1913, defendant filed a motion to set aside and quash the indictment, and also filed his affidavit in support of said motion. The affidavit alleges in substance that the in-

dictment was not found as required by the Code, and
that the grand jury had not received such legal evi-
dence as is contemplated by section 107, of the Criminal
Code; that the witnesses whose names are on the indict-
ment did not go before the grand jury, and that their
alleged testimony, or extracts and memoranda from it,
as taken by the official stenographer on the trial of D.
F. Deaton or Andrew Johnson and Doc Smith, were read
to the grand jury. On this motion the court heard evi-
dence. Mr. Letton, a member of the grand jury re-
turned the indictment, testified that no ladies appeared
before the grand jury. He did not remember whether
Herd McIntosh testified or not. Was under the im-
pression that Mick Crain was there. The court declined
to permit witness to testify whether or not Mick Crain
gave any evidence as to the whereabouts of Andrew
Johnson and Doc Smith on the day Ed Callahan was
killed. Witness was under the impression that a Mr.
Little was there. The same question was asked him in
regard to the evidence of this witness, but the court de-
clined to hear the evidence. Witness did not recall
whether Adam Stacy was there or not; did not recall
that Jas. Dixon or Geo. Moore was before the grand jury,
and did not think that W. H. Blanton or Charles Maupin
or Geo. Durbin or Harve Burns or A. H. Patton or Clay
Aldridge or James Young or Patton Ashburn were be-
fore the grand jury. Witness also testified that it was
his impression that only the transcript of the evidence
in the case of Commonwealth v. Fletcher Deaton, or in
the case of Commonwealth v. Doc Smith and Andrew
Johnson, was presented to the grand jury. Did not re-
member whether it was read or not. There were several
records in there.

Mr. Hodgkins, another member of the grand jury,
in answer to the question "How did you get the evi-
dence of Mrs. Callahan and Mrs. Gross and those peo-
ple,' answered "Well, think Mr. Crutcher or Mr. Davis
recited about how they testified." He further stated
that he remembered Mr. George Moore and Mr. Sam
Moore testifying in the case. They told about the testi-
mony of certain other witnesses. On cross-examination
Mr. Byrd asked the following question:

"Q. You were advised by the attorneys represent-
ing the Commonwealth that, in their judgment, the testi-
mony was sufficient to authorize indictment in this case,

and the other cases in which you did return the indictments for false swearing?

"A. Yes, sir."

After hearing the above evidence, the motion to quash and set aside the indictment was overruled. Thereafter each of the witnesses for the Commonwealth was asked the question whether or not he appeared before the grand jury, but on objection by the Commonwealth, the court declined to permit them to answer. In each instance the defendant avowed that the witness would state that he had not been before the grand jury.

Before going into trial the defendant filed an affidavit for continuance, based on the absence of certain witnesses for whom he claimed subpoenas had been issued and placed in the hands of the elisors three days before. The court refused a continuance, and would not permit the affidavit to be read as the testimony of the absent witnesses, except in the case of Jim Little.

The trial then proceeded. For the Commonwealth Judge Benton testified that defendant, M. C. Smith, appeared as a witness and was sworn by him on the trial of the case of Commonwealth v. Deaton. The official stenographer who reported the case of Commonwealth v. Deaton, testified that the defendant stated in substance on that trial that he saw Doc Smith and Andrew Johnson, or a man that was introduced to him or that was called Andrew Johnson, in the town of Jackson at or near Govan Smith's store or place of business on Saturday, May 4, 1912, the day Ed Callahan was said to have been shot. Asbury McIntosh, Mrs. Lillian Gross and Herd McIntosh, who were present at the time Ed Callahan was killed, all swear that they saw Smith and Andrew Johnson, at the time Ed Callahan was shot, on the side of the hill near Ed Callahan's house, about 125 or 150 yards distant. Doc Smith, one of the men indicted for the murder of Ed Callahan, testified that he and Andrew Johnson were together near Callahan's house on the morning of May 4, 1912, and that neither one of them was in Jackson during that day. On cross examination he stated that the other two men who were with him were Jim Deaton and David Deaton. They were all present when Ed Callahan was killed, and were firing at him. They went down there to lay Ed Callahan away. While there he thinks Jim and Andrew put up some forks—stuck them in the ground. He didn't pay any attention to them as he didn't need any. Near the con-

clusion of this, witness' testimony, the court took up the examination as follows:

"The Court: Do you know this defendant, M. C. Smith sitting over here?

"A. Yes, sir.

"Q. How long have you known him?

"A. I have known him a long time, eight or ten years.

"Q. Did you see him or have any talk with him that day, May 4, 1912, the day Ed Callahan was shot?

"A. No, sir."

The defendant's objection to the court's examination of the witness was overruled, and an exception saved. The Commonwealth then closed its evidence in chief.

The defendant testified that he lived about two miles from Jackson. Knew Ed Callahan well, and was a friend of his. He was in Jackson Saturday, May 4, 1912. He approached Jackson from the south side in company with Old Man Andy Hays. They crossed the bridge some time after nine o'clock. When they got to north Jackson they heard that Ed Callahan had been shot. He saw Govan and Doc Smith and Andrew Johnson immediately after the shooting. He knew Doc Smith, but did not know Andrew. Andrew was introduced to him by Doc or Govan Smith. He stayed there until three o'clock. He testified on the trials of Commonwealth v. D. F. Deaton and Commonwealth v. Doc Smith and Andrew Johnson, and testified to the same facts that he testified to in this case. Andy Hays testified that he was in Jackson on the morning of May 4, 1912, the day Ed Callahan was shot. M. C. Smith went with him. When they went over to Jackson he saw Doc Smith and Andrew Johnson and Govan Smith made him acquainted with them. He went to Jackson to make out his pension claim, and to pay Dr. Arnold's doctor's bill amounting to $2.50. On cross-examination, witness stated that he told several people that he might have been mistaken. After witness had been cross-examined by counsel for the Commonwealth, the court took up the examination as follows:

"Q. The Court: I want to ask you this question: Do you remember meeting me on the street yesterday and you stopping me and shaking hands with me?

"A. Yes, sir.

"Q. The Court: Didn't you tell me without my ask-ing you anything that you were mistaken in your testi-mony down here before?

"A. I said I thought I must have been mistaken.

"Q. The Court: That you came down here and swore that you saw them in Jackson May 4th, but that you were mistaken, and if you were mistaken about it you were honestly mistaken about it.

"A. Yes, sir, but I was talking then and swearing now."

Defendant's objection to the court's interrogating the witness was overruled, and exceptions saved.

In addition to the foregoing witnesses, Breck Flin-chem, Oscar Hagins, Bud Little, James Haddix and others testified that they saw Doc Smith and Andrew Johnson in Jackson on the morning of the day Callahan was shot. It was also shown that Asbury McIntosh, on his examining trial, testified that he knew nothing about the killing and did not know who did it. Afterwards he became a witness for the Commonwealth and testified that he recognized Andrew Johnson and Doc Smith as the parties who did the shooting. After giving this state-ment he stated to the jailer of Clark county that he did not see Doc Smith and Andrew Johnson the day of the shooting. It was further shown that Mrs. Gross and Mrs. Callahan stated to different parties after the kill-ing that they did not know who did it, and that they immediately telephoned for bloodhounds. There was also evidence to the effect that owing to the distance from the parties who fired the shot, and to the fact that they were concealed in the woodland, it was impossible at the Callahan house to identify them. It was also shown that on the first trial of D. F. Deaton, Govan Smith testified that Andrew Johnson and Doc Smith were in Jackson on May 4th. On the trial of Doc Smith and Andrew Johnson, both Govan and Doc Smith testi-fied to the same effect. In rebuttal several witnesses for the Commonwealth contradicted various statements made by the witnesses for the defendant. There was also evidence received that should more properly have been admitted in chief.

(1) It is insisted that the court erred in refusing to set aside the indictment on the ground that it was returned in violation of section 107 of the Code, which provides in part that "The grand jury can receive none but legal evidence." Section 281 of the Criminal Code,

as amended by the Acts of 1910, provides: "The decisions of the court upon challenges to the panel and for cause and upon motion to set aside an indictment shall not be subject to exceptions." In the recent case of Slaughter v. Commonwealth, 152 Ky., 128, a reversal was asked because of the error of the trial court in not setting aside the indictment on the ground that the names of the witnesses who appeared before the grand jury were not endorsed on the indictment as required by section 120 of the Criminal Code. After quoting the above section of the Criminal Code, the court said:

"In the recent case of Hendrickson v. Commonwealth, 146 Ky., 742, this court, after a review of all the cases bearing on the question, announced the rule that although an indictment fails to contain an endorsement of the names of the witnesses examined by the grand jury, this infirmity may be corrected by motion to quash or set aside the indictment upon arraignment of the prisoner as required by Section 157, Criminal Code, nevertheless, under Section 281 of the Criminal Code, a decision of the court upon a motion to set aside an indictment is not subject to exception and cannot be reviewed on appeal."

Section 281 of the Criminal Code, *supra*, is equally applicable in a case of this kind, and precludes us from reviewing the propriety of the court's action in refusing to set aside the indictment in question.

(2.) It is next insisted that the court erred in either refusing to grant a continuance or in refusing to permit defendant's affidavit to be read as the depositions of certain absent witnesses. As to certain of these witnesses the trial court found as a matter of fact that no subpoena had been issued for them, and there is nothing in the record to show that he erred in this finding. The affidavit alleged that both Mrs. James Bowling and Mrs. James Stidham, if present, would testify that they saw James Deaton in Fletcher Deaton's yard between nine and ten o'clock on the morning of May 4, 1912. The defendant also offered to prove this fact by other witnesses. The court excluded the evidence of the whereabouts of Jim Deaton on the idea that his presence with Doc Smith at the time the shooting took place was brought out on the cross examination by counsel for defendant, and being a collateral matter, defendant was concluded by his answer. Certain witnesses for the Commonwealth had stated that there were three men

present when the shooting took place. The witness Doc Smith was asked who the third man was. He replied that it was Jim Deaton. If Doc Smith's testimony be true, Jim Deaton was present with him and Andrew Johnson, and actually participated in the murder of Ed Callahan. It being contended that he was an actor in the tragedy, a participant in the crime, his whereabouts on that occasion were so much a part of the *res gestae* as to make them a material and relevant issue instead of a collateral issue. We, therefore, conclude that defendant was not bound by Doc Smith's answer that Jim Deaton was present when the crime was committed. The issue in the case being one of veracity between Doc Smith and the defendant as to whether Doc Smith and Andrew Johnson were in Jackson on May 4th, it was competent for the defendant to show not only that Doc Smith and Andrew Johnson were not at Ed Callahan's on that day, but were in Jackson, and also that Jim Deaton, who Smith claims was present with them at Callahan's, was also in Jackson on that day. In other words, it was competent to show that he testified falsely as to the whereabouts of any one of the alleged members of the conspiracy. We, therefore, conclude that the court erred in refusing to let the evidence in question go to the jury.

(3.) It is also urged that the court erred in interrogating the witnesses Doc Smith and Andy Hays in the manner hereinbefore set out. We see nothing in the examination of Doc Smith of which complaint may properly be made. Smith had testified to facts which, if true, made it impossible for the defendant to have seen him in Jackson on May 4, 1912. No one, however, had asked Smith the direct question whether or not he saw defendant in Jackson on that day. Thereupon the court asked the question. The question was the result of an effort to ascertain the truth, and to bring before the jury the real facts of the case, and there was nothing in the question or the form in which it was put from which could be gathered the court's opinion of the facts or of the weight or sufficiency of the evidence.

As to the examination by the court of the witness, Andy Hays, a different question is presented. It will be observed that by the examination hereinbefore set out, the court called on the witness to testify as to a conversation which the witness had had with the court the day before. There can be no doubt that the first

question asked by the court plainly indicated to the jury that the witness had had a conversation with the court the day before in which he stated that he was mistaken in his testimony. When the witness answered "I said I thought I must have been mistaken," the court was not satisfied with his answer. He went on, and for the purpose of bringing before the jury what the witness had really stated to him, asked the additional question "That you came down here and swore that you saw them in Jackson May 4th, but that you were mistaken    and if you were mistaken about it you were honestly mistaken about it?"    The effect of repeating this question was to bring before the jury exactly what the witness did say to the court, and to indicate to the jury what the court thought of his testimony. The trial court, in discussing this phase of the case in a written opinion overruling the motion for a new trial, used the following language:

"The situation presented was not free of embarrassment for the Judge. Three courses were open to him. When the witness Hays had testified as he did, one was to play the part of the figure head and the silent witness of a farce, another was to call the counsel on both sides to the bench and impart his information to them and leave it to counsel for the Commonwealth to propound the question to the witness, the other was for the judge himself to ask the questions. If the counsel had been called to the bench, or even taken to another room for such a purpose or such a conference, and the counsel for the Commonwealth had then propounded the questions to the witness it would have been perfectly obvious to the jury that the informaiton upon which the questions were based, had been furnished by the judge. The other course, the other one adopted by the judge, gave less prominence to this Hays episode than such a parade would necessarily have done, and some such consideration must have influenced the judge to adopt the course he did in propounding the questions himself instead of calling the attention of the counsel to what the witness Hays had voluntarily stated to him, and having them ask the witness the questions.

"The fact was one the jury was entitled to hear and consider and it cannot be said that the action of the judge was improper, prejudicial or illegal."

The court also quoted the following from the case of State v. Anderson, (S. C.) 137 Am. St. Rep., 887:

"A grave responsibility rests upon a trial judge. It is his duty to see to it that justice be done in every case, if it can be done according to law; and if he thinks that the attorney for either party, either from inadvertence or any other cause, has failed to ask the witnesses the questions necessary and proper to bring out all the testimony which tends to ascertain the truth of the matter under investigation, we can see no legal objection to his propounding such questions; but, of course he should do so in a fair and impartial manner, and should not by the form or manner of his questions, express or indicate to the jury his opinion as to the facts of the case, or as to the weight or sufficiency of the evidence."

We fully realize the fact that the situation of the trial judge was embarrassing, and perhaps we might have made the same mistake that he did. On reflection, however, it seems to us that the proper practice would have been for the court, at the next adjournment, to call the attention of counsel to the conversation which he had had with the witness. As it was Hays was one of defendant's principal witnesses—the very man he claims to have gone into Jackson with, and who was present with him at the time that he claims to have seen Smith and Johnson in Jackson. His testimony, therefore, was of the greatest importance. We think the authority cited by the trial court is a very clear statement of the duties of a trial judge. We accept that statement as a fair exposition of the law on the subject, but it seems to us that the questions propounded to the witness Hays and the manner of his examination, though doubtless not so intended, go beyond the limitations pointed out in that opinion. The necessary effect of the questions propounded was to place the court itself in the attitude of an impeaching witness. We, therefore conclude that this action on the part of the court was prejudicial to the substantial rights of the defendant.

(4.) It is next insisted that the court erred in receiving evidence in rebuttal which should have been adduced in chief. Doubtless there are a few instances where this occurred, but in view of the fact that the trial court has a reasonable discretion in admitting testimony in chief by rebuttal witnesses, it is only in very rare instances that a reversal will be decreed on this ground. Henson v. Commonwealth, 139 Ky., 173; Truax

v. Commonwealth, 149 Ky., 703. But on another trial the State will introduce in chief all its evidence in chief.

For the reasons indicated, the judgment is reversed and cause remanded for a new trial consistent with this opinion.