## Hill v. Commonwealth.

(Decided January 21, 1930.)

454

GEORGE R. SMITH and A. F. BYRD for appellant.

J. W. CAMMACK, Attorney General, and GEORGE H. MITCHELL, Assistant Atorney General, for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

It was on the 22d day of March, 1926, that Lillian Hill, a little girl 9 years old at the time, returned to her home at 238 Rand avenue, Lexington, Ky., from school about noon and found her mother in a dying condition as the result of wounds about her head which had been inflicted by a hatchet. The body of her mother was in the bathroom, but her head was in the living room resting in a pool of blood which had flowed from the wounds. Her mother's head was wrapped tightly in a rug, and she was unconscious. The little girl hurried to her and tried to get her to speak, but she did not. She then went to the windows and raised the shades which had been pulled down. Next she hurried to a next door neighbor in a home a few feet away and reported that something awful had happened to her mother. The neighbor hastened into the room and discovered the condition as briefly described. Another neighbor came in immediately thereafter, and, in looking around, discovered blood in the kitchen and that the trapdoor leading from the kitchen into the cellar was open. He heard a groan in the cellar and, descending the steps, he found the appellant. Lewis Hill, bloody and apparently unconscious lying in the cellar. The police were notified, and they came and took charge of the matter and removed Lewis Hill and his wife, Kate Hill, to the hospital.

The family of Lewis Hill consisted of his wife, Kate Hill, a son, Julius Hill, about 19 years of age, and the

daughter, Lillian Hill, about 9 years of age. The family resided in the southern part of the city of Lexington in a one-story brick building with 5 rooms and a bath all on the same floor. The rear of the building opened on a street known as Engman avenue, and fronted on Rand avenue. The house and porches occupied almost the entire space between the two streets, with a small yard on the front side of the house and a small space in the rear on the Engman avenue side. In front there was a porch extending across the entire width of the house, about 16 feet in length, and about 5 feet in depth. There was a door and window on the front porch. The door opened into a room, and just back of that room was another, and to the rear of that was another. The rooms were all of about the same size. To the left of the front room after entering the house was a door which opened into the living room. To the rear of the living room was the bathroom. The bathroom was about 8 feet square. There was a passway leading from the living room into the kitchen which was just back of the dining room. In the kitchen there was a small window in the rear on the southern side of the room and a door near the west side which opened out towards Engman avenue onto a rear porch. In the kitchen there was located a kitchen sink to the right of the door leading from the bathroom into the kitchen with a separate drainboard on the side next to the door. In the northeast corner of the kitchen was a water heater, and near the center of the kitchen was a kitchen stove. In the southeast corner of the kitchen there was a trapdoor extending north and south, which was about 5 feet by a little more than 2 feet. The trapdoor opened by lifting it up and resting it against the wall of the kitchen. On each side of the Hill residence was a house of similar construction to that of the Hill building.

After Mrs. Hill was taken to the hospital, she lived only a short time. There were three serious wounds on her head, one apparently having been made by the blade of the hatchet, which cut into the left side of her head to the brain. The two others were on the back of the skull apparently having been made by the poll of the hatchet crushing the skull. Lewis Hill had two wounds about his head and one across his nose.

Lewis Hill was indicted, charged with the murder of his wife. The first trial resulted in a hung jury, the second trial in a conviction fixing his punishment at death, but a new trial was granted on the ground of newly discovered evidence, and a third trial again resulted in a hung jury. A special venire was summoned from Jefferson county for his fourth trial. During the progress of that trial, because of some improper statements in the presence of the jury by a witness, the trial court, on the motion of appellant, discharged the jury. A special venire was summoned from Mason county for the fifth trial, which resulted in his conviction with the imposition of a life sentence by the jury. It is from the judgment of the last trial that this appeal is prosecuted.

The record is voluminous, and the evidence against appellant is circumstantial, and one of the grounds urged for reversal is that the verdict is flagrantly against the weight of the evidence. It is necessary to state concisely the major facts.

Appellant and his wife were about the same age, under 40 at the time of the tragedy. He was born and reared in Jessamine county near the town of Nicholasville, where he married. For some years prior to 1926 he was a guard at the State Reformatory at Frankfort. There he met a negro by the name of Percy Lewis. Lewis was a prisoner, having been convicted at different times of forgery, horse stealing, obtaining money under false pretenses, and escaping from prison. In February, 1926, Hill met Lewis on the streets of Lexington and had some talk with him. He learned, at the time that Lewis was preaching and also working in a tailor shop and cleaning and pressing establishment. Three or four days before the murder Hill was seen at different places in Lexington inquiring for Lewis. Finally he left a card at the home of the father of Lewis with the request that the information be conveyed to him that Hill had a suit of clothes he wanted cleaned and pressed. As Hill was leaving the home of Lewis' father, he met Lewis and made known his desires to him. This was on the 18th of March. He instructed Lewis to come to his place on Rand avenue the next day. Lewis was there the next morning and Hill obtained for him the suit of clothes and explained what he desired to have done to it. Mrs. Hill was present at the time. Hill then stated that there was something

wrong with his water heater in the kitchen, and he desired Lewis to assist him in taking it apart so that he could have it repaired. They went into the kitchen, and Lewis assisted Hill in removing a nut from a bolt so that the heater could be taken apart. There were two hatchets, one of which was held on the nut while the other was used to strike the one held against the nut. The nut was removed which Hill said was sufficient to enable him to get the part that he wanted so it could be repaired.

During this visit to the Hill home, Lewis suggested that he was selling clothing, and asked Hill to purchase a suit. This Hill agreed to do, and Lewis went to his place of business, obtained his samples, and returned to the Hill home. Upon his return, Hill selected the material for a suit and was measured by Lewis. This was on Friday. On Saturday Lewis returned the suit which he had carried away, but Hill did not have the money to pay the bill for the work which had been done, so he requested Lewis to return to his home later in the day. Lewis returned about 7 o'clock in the evening, but there was no response to his ringing of the doorbell. He returned later in the evening, and finally had a talk with Hill, when he was informed by Hill that he had not been able to see his boss, and for that reason did not have the money to pay the bill. Hill instructed him to return about 11:30 Monday morning, at which time he promised that he would have the money for him. Monday was the day of the tragedy.

There is no material difference in the evidence of Hill and Lewis as to the occurrences on Thursday, Friday, and Saturday. The disagreement in their evidence is about what occurred on Monday. Lewis testified that he went to the Hill home about 11:45 Monday morning and rang the doorbell, but there was no response. He left and returned a little later and again rang the doorbell. His second trip was after the tragedy had been discovered, and Hill and his wife had been removed to the hospital. That Lewis returned the second time is amply established by police officers who were nearby and by others. He showed the bill which he had against Hill to one of the police officers and explained that he was trying to collect the bill. According to his testimony, he did not see Hill on Monday and was not in the Hill home.

On the other hand, Hill testified that, when Lewis came to his home on Monday, he was admitted, and that he requested Lewis to assist him further with the water heater. They went into the kitchen, according to Hill's testimony, and again undertook to take the heater apart. While they were working on it, Hill testified that he had $5 which he had borrowed on Saturday night, and that he offered to pay Lewis the bill for pressing, but Lewis did not have the change. At the time he told Lewis that he could not take the suit which he had ordered because he did not have the money to make the $5 down payment. Lewis then said to him, according to Hill's testimony, in effect, that it was the way of white folks to try to keep the colored man down, and immediately Lewis struck him with a hatchet, rendering him unconscious, and he did not know anything else that took place until he regained consciousness later in the day at the hospital.

Neighbors who lived nearby did not see any one leave the Hill home about the time of the tragedy. One witness who lived next door was able to fix the time of the tragedy by what she heard in the Hill home. She heard some man in the back room talking loud and angrily, next she heard a crash, a few minutes later she heard a second crash, but she heard no one cry out. This was between 11:30 and 12 o'clock, and a short while only before Lillian Hill returned home from school. This witness was looking around for a little dog that had strayed away, and was on her front porch immediately after the first crash that she heard and before she heard the second crash. The wall of her house was only 4 feet from the wall of the Hill house. She saw no sign of any one either entering or leaving the Hill house at the time.

Mrs. Hill never regained consciousness, but some time during the afternoon of the tragedy Hill was sufficiently aroused to answer a question which was asked him about what had happened, and, when he was asked who it was that had struck him, he replied with the one word "Percy." The officers then sought out and found Percy Lewis and placed him under arrest. They carried him before Hill at the hospital, when Hill stated to the officers in the presence of Lewis that Lewis was the man who struck him. Lewis vigorously protested that he had done nothing of the kind. Some witness stated that, when Lewis was charged by Hill with having struck him, his

knees gave way, or showed signs of giving way, and counsel for appellant take the position that his actions indicated guilt. That does not necessarily follow. It would probably make the stoutest heart quake if its possessor should be charged with such a brutal murder.

That there were wounds on Hill's head and face is clearly established. Dr. Van Meter examined him at the hospital, and he is the most formidable witness for the commonwealth. According to his testimony, the wounds on Hill were not made with a hatchet, and were very slight. They were not sufficient to render Hill unconscious. He was not unconscious, but was shamming unconsciousness, according to this witness. There is no more important point in the case than whether Hill was conscious or unconscious at the time he was taken to the hospital. If he was shamming unconsciousness, it was a badge of guilt impossible of explanation. Dr. Van Meter was subjected to a most gruelling cross-examination. His testimony was unshaken, and he gave reasons in support of his belief that Hill was shamming unconsciousness. It is true that police officers of long experience and undoubted veracity gave it as their opinion that Hill was unconscious at the time he was taken to the hospital. An interne in the hospital who saw him was also of the opinion that he was unconscious. Other doctors answering hypothetical questions based upon the facts and circumstances gave it as their opinion that he was unconscious.

There is no doubt from the evidence in this record that either Hill murdered his wife, or that Percy Lewis was the guilty criminal. The commonwealth undertook to show that the circumstances and facts deducible from the evidence were such as to point to the guilt of Hill beyond a reasonable doubt. To establish motive, the commonwealth established that the father of Hill died in Jessamine county not long before the tragedy. He left a paper purporting to be his last will and testament. Hill was executor. Proceedings were instituted to set aside the will, and, when the will was set aside, E. B. Hoover was appointed administrator. Hill had qualified as executor by executing a bond signed by a guaranty company. When Hill was called upon to settle with the administrator, he was not able to do so, and it was found that he was indebted to the estate in the sum of $2,085.

This sum was paid by the guaranty company. To indemnify the company, Hill agreed to assign to the guaranty company his interest in his father's estate. The heirs signed an agreement that Hoover should sell the real estate and divide the proceeds. Mrs. Kate Hill, the murdered woman, signed the agreement. The proceeds of the sale to the extent of Hill's interest were to be paid to the guaranty company. The property was sold, and, when it came time to execute a deed to the purchaser, Mrs. Kate Hill refused to sign the deed. Hill caused a deed to be prepared by a prominent attorney in Lexington which he executed. He took it to his wife, who refused to execute it. Probably he made more than one effort to have her sign it, but she was firm in her refusal. She seemed to be possessed of an idea that her children were being deprived of something that was theirs, and for that reason she was unwilling to execute the deed. Hill was advised that it would be necessary to institute a suit to compel a performance of the contract, and this was done. Hill, at his own request, was made a party defendant. Judgment was entered directing Mrs. Hill to appear at the courthouse at a certain hour and sign the deed, but this she failed to do. Hill was advised that, if his wife persisted in her refusal, probably it would be necessary to appoint a commissioner to execute the deed for her. It is insisted by the commonwealth that, Hill having subjected himself to prosecution by his inability to account for that part of the estate which had come into his hands, he was deeply interested in having the deed executed, and that the failure of his wife to sign the deed afforded a motive for his commission of the crime.

The commonwealth established by Lillian Hill that her father and mother had talked about the execution of the deed a number of times, and that her father had said to her mother that, if she did not sign the deed, he would get in trouble over it. She also testified that her father had threatened to kill her mother with a chair or to choke her to death if she did not sign the deed.

It is also the position of the commonwealth that Hill laid a deliberate plan to have the disreputable negro, Percy Lewis, about his home at or near the time of the commission of the crime, so that suspicion might be directed to the negro. Counsel recite the evidence showing that Hill had sought out the negro under peculiar

circumstances, with no better excuse than his desire to have Lewis come to his home to obtain a suit of clothes to be cleaned and pressed; that the fact that he was diligently searching for Lewis is a circumstance against him according to the contention of the commonwealth. It is also insisted that he fixed the hour for Lewis to come to his home on Friday and on Monday when the children would be absent from home. It is urged that the using of the hatchets on the heater was a part of his scheme to make it appear that the negro was the guilty party. It is also pointed out that his claim that he borrowed money with which to pay the bill was untrue, as he was contradicted on that point by the man from whom he said he borrowed the money. It is also argued that the proof clearly established that the negro did not commit the crime. His conduct in returning to the home immediately after the commission of the crime, when he was seen by the police officers and others, is most persuasive that he had no knowledge of the commission of the crime at that time.

There was blood in the kitchen near the heater. It was on the floor. There was a streak of blood from the heater towards the trapdoor. There was also a spot of blood in the living room. Of course, there was much blood about the head of Mrs. Hill. Who it was that opened the trapdoor is unknown. It could have been opened by Hill as well as by Lewis, if Hill was conscious at the time. How the rug was wrapped around the head of Mrs. Hill is another thing that is not susceptible of proof. Whether she was killed in the bathroom, in the kitchen, or in the living room is only a matter of conjecture.

The evidence very briefly set out above was sufficient to make a case for the jury, and, if there were no errors which deprived appellant of a fair trial, the judgment of conviction will have to stand.

It is first insisted that the evidence of the proceedings in the Jessamine circuit court, the papers relating to the settlement with Hoover, and all other matters relating to these transactions, were incompetent for any purpose, and that the trial court should have sustained the objections of appellant to this line of evidence. The trial court admitted the evidence on the ground that it tended to show a motive for the commission of the offense. Roberson's New Kentucky Criminal Law and

Procedure (2d Ed.), in section 510, contains a statement of the law on this particular point which the author deduced from the decisions of this court. The author states the rule to be that it is always competent for the commonwealth to prove the existence of a motive for the commission of a homicide as rendering more probable the inference that the defendant killed the deceased. He says that a motive for the killing in question often becomes important if not essential on a trial for murder. He lays down the rule that, in case of doubt as to whether a party charged did the criminal act, or where the evidence to establish the killing is circumstantial, proof of motive is of great importance. It is never necessary to a conviction that a motive for the killing should be established, but the establishment of motive, particularly in a case where circumstantial evidence is relied on, is always important. Motive for a murder may be established by circumstantial evidence.

As was held in the case of O'Brien v. Com., 89 Ky. 354, 12 S. W. 471, 11 Ky. Law Rep. 534, where the commission of crime can be shown only by proof of circumstances, the evidence should be allowed to take a wide range. Otherwise the guilty would often go unpunished. It was there held that any fact which is necessary to introduce or explain another fact, or which affords an opportunity for any transaction which was in issue, or which shows facilities, or motives, for the commission of the crime, may be proven.

In Childers v. Com., 161 Ky. 440, 171 S. W. 149, it was held that the commonwealth might introduce evidence of any pertinent facts or circumstances tending to show threats, ill will, or bad feeling on the part of the accused towards the deceased, or a motive that may have contributed to influence the commission of the act.

In the late case of Blankenship v. Com., 228 Ky. 830, 16 S. W. (2d) 478, 480, this court said: "Motive, when established, is a link in the chain forming a series of events which may identify the perpetrator of the crime. Proof of motive alone is not sufficient to establish the guilt of the accused (citing case). To establish motive is to establish a starting point from which a series of events may be built up leading from the motive to the crime."

Under these authorities, and there are many others to the same effect, the evidence relating to the failure of appellant to settle with the administrator of his father's estate was competent. It may be that he thought he would be prosecuted if he could not satisfy the guaranty company, although he was informed, apparently, that the deed could be executed by a commissioner signing for his wife. At all events, the evidence tended to show ill feeling between him and his wife growing out of her failure to sign the deed, and especially is this true in view of the evidence of loud talk in the Hill home just before the tragedy.

The next ground urged for reversal is that the evidence of Dr. Van Meter, to the effect that Hill was shamming unconsciousness, was unreasonable and based solely upon the suspicions of the doctor, and that, in the light of his own statements and admissions, it is shown that his suspicions were not well founded. That Dr. Van Meter testified that appellant was shamming unconsciousness cannot be disputed. He gave that as his professional opinion, and he gave reasons as the basis for his opinion. It is true that others contradicted his conclusions, but the weight of evidence in such cases is ordinarily for the jury, and we cannot, in a case such as this, hold as a matter of law that the jury should not have accepted the statements of Dr. Van Meter because some other witnesses testified that his conclusions were unreasonable. His reasons strike us as being very forcible.

The next ground urged for reversal is that the trial court erred in not sustaining motions and amended motions for a change of venue. The petition and affidavits in support thereof are found in the record. The reasons why a change of venue should have been granted are well presented in the petition filed by counsel for appellant. There are affidavits to the effect that the feeling against appellant was such that he could not have a fair trial in Fayette county. The trial court heard evidence on the question pro and con, and reached the conclusion that the appellant could have a fair trial in Fayette county. Jealously guarding the rights of appellant against any suspicion of unfairness, a jury was brought from Mason county. Changing the venue is entirely within the sound discretion of the trial court. He cannot exercise that discretion arbitrarily or capriciously. He considers the evidence as a whole, and if,

in the exercise of a sound discretion, he reaches the conclusion that a defendant may have a fair trial in a county, the matter is at an end, as this court will not reverse a judgment because of a failure to change the venue unless there was an abuse of discretion on the part of the trial court. The case of Hutsell v. Com., 225 Ky. 492, 9 S. W. (2d) 132, is a sufficient citation of authorities. It refers to many cases stating the general rule. We are of the opinion that the trial court did not abuse a sound discretion in overruling the motions for a change of venue. The cases of Shipp v. Com., 124 Ky. 643, 99 S. W. 945, 10 L. R. A. (N. S.) 335; Bradley v. Com., 204 Ky. 635, 265 S. W. 291, and Estes v. Com., 229 Ky. 617, 17 S. W. (2d) 757, did not announce a contrary doctrine to that herein stated. In these cases the trial court abused a sound discretion.

The last three cases mentioned relate to the effect that should be given to the summoning of a jury from another county where the trial court denied a change of venue. In each of the cases it was found that the defendant had presented a state of facts which showed that he could not have a fair trial in the county, although before a jury, residents of another county. We do not have such a case before us as, in our opinion, the trial court did not abuse a sound discretion in refusing to grant a change of venue.

Counsel for appellant appear to argue, in their brief, that the trial court was of the opinion that the burden of proving facts which would entitle appellant to a change of venue was not properly placed. Under the provisions of section 1110, Ky. Stats., the defendant in such a case, in support of his application for a change of venue, must file the affidavits of two witnesses showing that he cannot have a fair trial in the county where the offense was committed. When he does this, he has met the burden of proof, and has made out a prima facie case. Wilkerson v. Com., 88 Ky. 29, 9 S. W. 836, 10 Ky. Law Rep. 656; Higgins v. Com., 94 Ky. 54 21 S. W. 231, 14 Ky. Law Rep. 729; Greer v. Com., 111 Ky. 93, 63 S. W. 443, 23 Ky. Law Rep. 489; Draughan v Com., 45 S. W. 367, 20 Ky. Law Rep. 102; Bishop v. Com., 58 S. W. 817, 22 Ky. Law Rep. 760.

If the commonwealth files an answer to the petition for a change of venue controverting the facts alleged in

the petition, that does not have the effect of shifting the burden of proof, because the burden has already been met by the defendant when he files his petition supported by the required affidavits. The filing of the response or answer by the commonwealth has no effect, but, if the commonwealth introduces evidence to combat that which is produced in behalf of the defendant, the trial court must consider all of the evidence, and, unless the defendant has met the burden on the whole, the application for a change should be denied. Unless there has been an abuse of discretion by the trial court which is apparent from a consideration of the evidence, this court will not reverse, although the court may be of the opinion that the trial court improperly held that the defendant had not sustained his application for a change of venue by the burden of proof. The discretion of the trial court must be abused before this court will interfere in such matters. Roberson's Criminal Law, sec. 162; Heck v. Com., 163 Ky. 518, 174 S. W. 19; Hutsell v. Com., supra.

It is insisted by counsel for appellant that the motion to quash the indictment on the ground that appellant had been called before the coroner's inquest and had testified at a time when he was both physically and mentally incapacitated should have been sustained, and that the evidence given by him at such inquest should not have been allowed against him. In support of the motion to quash the indictment, an affidavit was filed by Hill showing that an inquest was held by the coroner for the purpose of securing evidence against the person who had murdered Mrs. Hill. He stated in his affidavit that he was not warned that there was suspicion against him, and that he was not admonished by the coroner, or any one, that he need not testify, or that, if he testified, his evidence so given could be used against him. Further in his affidavit he stated that he was suffering under a great mental strain at the time. His affidavit did not state that his testimony was involuntary, and neither does he state in his affidavit that the testimony given by him before the coroner was used before the grand jury. The trial court delivered a written opinion overruling the motion to quash the indictment, in which he discussed the leading case on the question. People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193. It was held in that case that, if the person who testified at the inquest

did so simply as a witness, he had none of the rights or immunities of a party so testifying. The court said that the very foundation of the rule that a person who testified at an inquest may not be confronted with his testimony so given upon a trial was that he must testify as a party in such a hearing and not merely as a witness. The trial court also relied on the case of Pruett v. Com., 199 Ky. 33, 250 S. W. 131, as well as other cases to the same effect. The cases of People v. Lauder, 82 Mich. 109, 46 N. W. 956, and State v. Comer, 157 Ind. 611, 62 N. E. 452, are cited and relied on by the trial court in his opinion. The conclusion of the trial court was expressed in this language: ''I am of the opinion that it is not the law in Kentucky that if a person voluntarily testifies as a witness before a coroner's jury, which is investigating a murder, that if he thereafter should be indicted for that murder, the indictment should be quashed. If such were the rule every person guilty of a crime but not arrested could voluntarily testify before a coroner's inquest and would thereafter be immune from prosecution for a crime he had committed. The case of Bentler v. Com., 143 Ky. 503, 136 S. W. 896, states the correct principle, but in that case the person did not testify voluntarily, but testified involuntarily, which is an entirely different case from that which we have under consideration.''

The conclusion of the trial court on the motion to quash the indictment was correct. But we are prohibited from a consideration of the alleged error by the provisions of section 281 of the Criminal Code of Practice. There is a long line of cases holding that decisions of the trial upon a motion to set aside an indictment are not reviewable by this court. Slaughter v. Com., 152 Ky. 128, 153 S. W. 46; Jenkins v. Com., 167 Ky. 544, 180 S. W. 961, 3 A. L. R. 1522; Smith v. Com., 154 Ky. 613, 157 S. W. 1089; Owens v. Com., 188 Ky. 498, 222 S. W. 524; Harris v. Com., 195 Ky. 693, 243 S. W. 932; Sowders v. Com., 197 Ky. 834, 248 S. W. 187; Sloan v. Com., 211 Ky. 318, 277 S. W. 488; Brannon v. Com., 215 Ky. 589, 286 S. W. 785.

It is urged by counsel for appellant that the evidence of Percy Lewis and other witnesses showing the movements and actions of Percy Lewis on the day of the murder, both before and after the killing occurred, was

incompetent, or, if competent at all, it should have been introduced in rebuttal. The evidence was competent. The appellant insisted, in his testimony, that Percy Lewis assaulted him, leaving the necessary inference that it was he that murdered Mrs. Hill. The trial court has a discretion in determining whether evidence shall be introduced in chief, or in rebuttal, and, unless his rulings on the question prejudiced the substantial rights of a defendant, a case will not be reversed because of errors in not following the strict letter of the law as to the time of the introduction of the evidence.

The commonwealth attempted to establish by circumstances that appellant had deliberately sought to have Percy Lewis about his home near the time of the commission of the murder so that suspicion might be directed against him. The evidence which showed that appellant had sought to locate Lewis at different places was competent.

One of the witnesses testified that Mrs. Hill had bruises on her arm. He stated that the bruises appeared to have been made by some one who grasped her arm. The witness, not claiming to be an expert, should not have been allowed to express an opinion, but the error was insignificant and trivial.

An effort was made to show by a certificate from the War Department that Percy Lewis had been discharged from the army because he was not mentally sound. The trial court excluded the evidence, and it appears to us that the certificate as offered was but hearsay testimony. It stated no more than that some army officer had stated that Lewis was suffering from dementia precox. The mental condition of Lewis could not be proven by hearsay testimony. It is insisted that section 1637a2, Ky. Stats., Supp 1928, makes such a certificate competent evidence, but that section does not appear to support the contention of counsel for appellant. It makes such a certificate competent as evidence in any proceedings in the courts in this state in which the discharge paper may come in question, and in which it could be used as legal evidence of any fact. This is not such a case.

The last ground relied on for reversal is that one of the attorneys representing the commonwealth was guilty of misconduct in his argument before the jury.

The argument chiefly complained of is the statement, or rather the question asked of the jury, whether, in its opinion, on the evidence, the grand jury would have preferred to indict appellant or Percy Lewis. We see nothing prejudicial in that argument. Under the authority of the case of Pitts v. Com., 215 Ky. 843, 287 S. W. 34, we must conclude that the argument complained of was not such as this court will seize upon as a ground for reversal because, upon the whole record, it appears that it was without prejudice to the substantial rights of appellant.

Our consideration of the case has led us to the conclusion that appellant has no reasons to complain of the judgment below.

Judgment affirmed.