IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 12, 2006 Session

## TRAVIS PARSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-07733, 34, & 36     Paula Skahan, Judge**

---

**No. W2006-00094-CCA-R3-PC  - Filed January 4, 2007**

---

Petitioner, Travis Parson, was convicted of two counts of especially aggravated robbery and one count of criminally negligent homicide. He was sentenced to consecutive sentences of twenty years for each robbery conviction, and a concurrent sentence of two years for his homicide conviction, for a total effective sentence of forty years. On direct appeal, this Court ruled that the record did not support consecutive sentencing, and that dual convictions for especially aggravated robbery violated principles of double jeopardy. We therefore modified one of the convictions to aggravated assault and remanded that conviction for sentencing. His total effective sentence was amended and reduced to twenty years. In September 2004, Petitioner filed a pro se petition for post-conviction relief alleging ineffective assistance of counsel. Counsel was appointed and an amended petition was filed. The post-conviction court subsequently denied relief. Petitioner now appeals that denial arguing that counsel was ineffective for (1) failing to present a second defense of misidentification, and (2) failing to call Petitioner's mother to "bolster" his alibi.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

John B. Curtis, Memphis, Tennessee, for the appellant, Travis Parson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

The facts as set forth by this Court on direct appeal are as follows:

On the evening of December 28, 2000, the victim, Mahmoud Ghannam, who managed the Discount Shop, was on duty with a fellow employee, Yehia Abu-Hamda. Shortly after 9:00 p.m., the victim heard a noise and saw two men two or three meters away "just in front of the door." One was short and one was tall. Both wore masks. The victim was struck by two bullets, fell to the floor, and then heard between seven and ten more shots, but was unable to tell who was firing. When he sat up to call for help, he realized that the tall man was still in the store and so he remained quiet until he left. The victim described the taller man as wearing a "jacket with cream color and light blue" with a San Francisco logo in white letters trimmed in red. The victim was unable to see the face of either of his assailants but determined that they were black based upon the color of their hands. According to the victim, the defendant Parson was a regular patron of the Discount Shop and had worn the San Francisco jacket on numerous occasions.

After waiting to make sure that no one else was in the store, the victim went to the office behind the counter area, where Abu-Hamda was lying on the floor in a pool of blood. The victim pushed the store security button to summon police. He then used Abu-Hamda's cellular telephone to call 911 and report the shootings. Abu-Hamda died from multiple gunshot wounds from a high velocity weapon. A cigar box in which store employees held large bills was discovered missing. Approximately $1,400 to $1,600 was determined to have been taken in the robbery.

Sergeant William Dwayne Merritt, a homicide investigator with the Memphis Police Department, coordinated the investigation. A tip from Crime Stoppers led to the arrest of the co-defendant Johnson, who initially provided the police with a fictitious name for the co-perpetrator. Eventually, he implicated the defendant. Afterward, Sergeant Merritt interviewed the defendant, who initially denied any involvement in the robbery and shooting. After being informed that Johnson had already given an incriminating statement, the defendant acknowledged that he had participated in the robbery. The defendant claimed that the robbery was Johnson's idea and that Johnson had provided him with a loaded double barrel shotgun. The defendant contended that he fired a single warning shot upon entering and did not otherwise fire his weapon. He claimed that Johnson had an assault rifle and took approximately $280 from a cigar box and also stole some cigarettes. The defendant stated that his share of the stolen money was approximately $130. According to Sergeant Merritt, Johnson was "much shorter" than the defendant. While there was a security camera in the store, it was not recording at the time of the offenses.

Keith Hull, the defendant's brother, testified as an alibi witness for the defense. He claimed that the defendant telephoned him at his residence at approximately 9:00 p.m. on the evening of the robbery. He contended that his caller identification indicated that the defendant was calling from his mother's residence, where he was

living at the time. According to Hull, they talked for approximately fifteen minutes, discussing basketball and New Year's Eve plans.

The defendant, who was twenty-three years of age at the time of the trial, claimed that he was at his mother's residence at the time of the offenses, visiting with his girlfriend and her two children. He contended that they did not leave the residence at any time that day and insisted that he had telephoned his brother at approximately 9:00 p.m. to discuss a New Year's Eve party. According to the defendant, he was initially contacted by the police on January 3, about a week after the robbery. That evening, Detective Sheridan picked him up at his mother's residence and drove him to the police station. The defendant contended that he initially denied any involvement in the offenses, but that he eventually confessed after four hours had passed because the detectives told him that if he "didn't give a statement that was similar to [co-defendant Johnson's] that they were going to make sure that [he] faced the death penalty." The defendant denied having participated in the offenses and maintained that he obtained the details he provided officers from Johnson's statement. The defendant also denied having ever owned a cream and light blue San Francisco jacket. He contended that his then-girlfriend was not present at his trial to offer alibi testimony because of "[d]isagreements and things of that such." The defendant explained that his mother could not offer such testimony because she was away from her residence on the evening of the offenses.

*State v. Travis Parson*, No. W2002-02743-CCA-R3-CD, 2004 WL 404487, at *1 -2 (Tenn. Crim. App., at Jackson, Mar. 3, 2004) (no Tenn. R. App. P. 11 application filed).

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner's brother, Keith Hull, testified that around the time of the incident he saw Petitioner once or twice a week. Mr. Hull and Petitioner played basketball together. Mr. Hull never saw Petitioner in a jacket with a logo reading "San Francisco" or "S.F" and did not know whether Petitioner owned such a jacket. Mr. Hull recalled Petitioner wearing a "small jacket" made of nylon that was orange, green, and white in color. Mr. Hull spoke with an investigator and counsel both prior to and at trial. He said that neither of these individuals asked him about a jacket before or during the trial. Mr. Hull said that Petitioner called him from their mother's house and they spoke on the telephone around the time of the robbery. Mr. Hull did not see Petitioner on the day of the robbery.

Petitioner's mother, Joyce Ann Parson Matlock, testified that on the night of the incident Petitioner was staying at her home while she was away because her house had previously been burglarized. Ms. Matlock was away from the home staying with her daughter who was having a difficult pregnancy. She spoke to Petitioner on the telephone the day of the incident, but she did not see him and could not testify as to what clothes he was wearing that day. According to Ms. Matlock, Petitioner owned a light-weight, orange and green, nylon jacket and a heavier Fed Ex jacket intended

-3-

for cold weather. Ms. Matlock did not recall Petitioner wearing a jacket other than these two. She did not know whether Petitioner owned a cream and light blue "San Francisco" or "S.F." logo jacket. Ms. Matlock did not want to testify at Petitioner's trial because she believed in the "system" and thought that if Petitioner told the truth, everything would work out the way it was supposed to.

Petitioner testified that when he initially met with trial counsel she did not want to discuss trial strategy because there was nothing she could do to help Petitioner. According to Petitioner, counsel told him that it was "hard to defend somebody that's probably, you know, stepping over dead bodies to rob somebody," so he did not feel like she was looking out for his best interests. Petitioner said it was difficult to get in touch with counsel and that he wrote to her on several occasions without response. He said that he did not meet with trial counsel "enough," and when they did meet, the meetings were not effective.

Petitioner specifically complained that he spoke with counsel about several witnesses that he wanted her to call at trial, including his girlfriend at the time, his brother, his mother, and his sister. He acknowledged that his brother testified as an alibi witness at trial. Petitioner said that he wanted his brother, along with the other witnesses, to testify that he did not have a San Francisco jacket of any kind. He also wanted his girlfriend to testify that he was with her at the time of the incident and his mother to testify that he was house-sitting for her during that time.

Petitioner did not know why counsel failed to call these witnesses to testify. He said he also did not know why counsel failed to interview other family, friends, neighbors, or co-workers to ascertain whether anyone had ever seen Petitioner wearing a San Francisco jacket like the one identified as having been worn by the perpetrator of the robbery. Counsel likewise failed to investigate whether anyone had seen Petitioner's girlfriend wearing such a jacket. Additionally, trial counsel failed to investigate whether Petitioner's co-defendant was "upset" because Petitioner had asked his co-defendant to leave his mother's house.

On cross-examination, Petitioner admitted that he conveyed to counsel everything that he knew about the case. He acknowledged that counsel contacted some of the witnesses about testifying. He said that his brother testified at trial, that his mother did not want to testify at trial, and that trial counsel could not reach his girlfriend because he lost contact with her after some "disagreements" and did not know how to locate her at the time of trial. Petitioner did not know whether his sister had been contacted about testifying.

Petitioner next admitted that he gave a signed statement to the investigating detective stating that he was present at the scene when the robbery occurred, that he was carrying a sawed-off shotgun, and that he took $130.00 from a cigar box belonging to the store. Petitioner insisted that the statement was coerced, but acknowledged that the trial judge denied his motion to suppress his statement finding that the statement was knowingly, voluntarily, and intelligently given. Petitioner admitted that he had been in the discount store on other occasions prior to the incident. He said that the surviving witness had seen him in the store on those occasions. Petitioner did not recall the surviving witness testifying that "it was the tall one that stayed in the store and did the robbery after

-4-

[the victims] were shot." Petitioner denied being in the store with his co-defendant on the night of the robbery.

Petitioner then rested and the State called Petitioner's trial counsel to the stand. Trial counsel testified that when she first met Petitioner he told her that he did not shoot anyone, that he held the door open while his co-defendant, the shooter, went into the store. He told her that they did not intend to kill anyone. Specifically, he told counsel "it wasn't supposed to be a killing . . . it was only supposed to be a robbery and it went bad." Petitioner admitted to counsel that he was at the scene and that he did take the money and some cigarettes and that his gun may have discharged and hit the ceiling.

Counsel said that she explained the concept of co-defendant liability to Petitioner. She told him that the likelihood of being convicted was great because a jury would not have sympathy for a man who held the door in order to help another man murder someone. They discussed possible defenses and trial strategy at length on a number of occasions. Petitioner indicated that he wanted to serve as little time as possible and counsel persisted in explaining that "the defense he had did not lend itself to not guilty."

Approximately one year later, after Petitioner's co-defendant was convicted of first-degree murder and sentenced to life in prison, Petitioner changed his story. Counsel went to see Petitioner in jail and he explained to her that he did not initially trust her and so he had not been truthful in the beginning. He explained that he had an alibi defense and that he now trusted her and wanted to relay his story and give her the names of several witnesses who could confirm his alibi. At this point, counsel made the decision to change the defense strategy. Prior to this time, counsel had taken the names of potential witnesses. She said she initially did not know what role the witnesses would play. She also said she had not fully developed a defense strategy at this time since Petitioner had not heretofore presented a very defensible set of facts and had not alleged any witnesses were present at the scene.

Counsel proceeded to investigate the potential witnesses, talking again with Petitioner's mother and brother. Petitioner's new story was essentially that at the time of the incident he was at his mother's house with his girlfriend, he had spoken to his brother on the phone while at the house, and his brother could verify his whereabouts during the time the robbery was committed. Counsel attempted to contact the girlfriend since Petitioner claimed to have been with her when the murder occurred. She tried to reach the girlfriend at the address and phone number given to her by Petitioner. She also enlisted the aid of an investigator and Petitioner's brother in trying to locate the girlfriend or get information about her, but she was never successful in doing so. Eventually, Petitioner told counsel to "leave it alone" because he and the girlfriend were at a "bad point" in their relationship and she may not provide favorable testimony for his defense.

Trial counsel felt that she had conducted a satisfactory investigation into Petitioner's alibi claim. Counsel stated that the "list of alibi witnesses dwindled, and for various reasons either because we couldn't find them or they didn't feel they were - - should testify for reasons that were

-5-

really not made known to me, it came down to his brother, Mr. Hull, and that was - - [Petitioner] and I had the conversation and said we'll just go with him." Counsel said that Petitioner's mother did not want to testify and Petitioner did not want to force her to testify. Counsel explained that her choice not to testify was not harmful to Petitioner's case because her testimony would have been that Petitioner was staying at her home during the time period of the robbery, although she could not verify that he was actually there at the time the robbery was committed.

After deciding on an alibi defense, counsel did not feel it necessary to prove that Petitioner did not own a San Francisco jacket. She explained that the State had to prove the jacket existed and no evidence of the jacket, pictures or otherwise, was ever presented. Additionally, there was nothing identifying the Petitioner as the one wearing the jacket on the night of the incident, no identification of Petitioner at the scene, nor any evidence linking Petitioner to the jacket. Counsel's theory was that there was no proof that the jacket actually existed, she stated "[t]here was even an issue of the colors because the "S.F.," to me, would indicate 49'ers, but the colors didn't match 49'ers." Counsel explored the idea that the witness was mistaken about the color or type of jacket, but finally concluded that "it was inconsistent to try to prove he didn't have a jacket when our defense was that he wasn't there - - regardless of a jacket, he wasn't there." She acknowledged that it was a tactical and strategic decision not to pursue Petitioner's connection with the jacket.

Counsel admitted that it would not have hurt to put on witnesses that could say that they had never seen Petitioner in a jacket like the one described, but she felt it was a minor issue that would not necessarily have been helpful to Petitioner given his alibi defense. She stated that through cross-examination she opened the door to the possibility that somebody else might have been wearing the jacket on the night of the robbery, and that there might be many such jackets in existence. She did not question Petitioner's brother about the jacket because he could not definitively say Petitioner did not own such a jacket.

Counsel felt that she had adequate time to prepare for trial. She discussed trial strategy with Petitioner, she discussed his change in story with him, she adequately investigated his alibi claims, and she felt that with the information available to her she provided Petitioner with the best possible defense.

## II. Analysis

Petitioner raises two issues in support of his argument that counsel provided ineffective assistance. In his first issue, Petitioner argues that counsel was ineffective in that she did not raise a second defense of misidentification. In his next issue, Petitioner argues that counsel was ineffective in that she failed to call his mother, Ms. Matlock, to bolster his alibi defense.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 23 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense."

*Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). The error must be so serious as to render an unreliable result. *Id*. at 687, 104 S. Ct. at 2067. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. *Id*. at 695, 104 S. Ct. at 2067. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner bears the burden of proving his allegations by clear and convincing evidence. T.C.A. § 40-30-210(f). The findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *See Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields v. State*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

With respect to his first argument, Petitioner contends that the facts supported a second defense that the perpetrator was not Petitioner because the perpetrator was wearing a unique San Francisco jacket and Petitioner had never owned or worn such a jacket. He asserts that his mother and brother were available to testify to the fact that they had never seen Petitioner wearing a San Francisco jacket like the one described by the surviving victim. He then alleges that counsel was ineffective for failing to call the witnesses to testify to this fact because there is a reasonable probability that the outcome of the trial would have been different if the jury had been presented with this evidence.

The post-conviction court found that Petitioner did not meet his burden of establishing that he was prejudiced by counsel's decision not to present a second defense. The court initially noted that Petitioner's mother and brother were not able to testify to the fact that Petitioner did not own

a San Francisco jacket, only that they had never seen him wearing such a jacket. The court then pointed out that trial counsel did not present proof regarding the jacket because "she thought it was incompatible with an alibi defense." The court went on to say that "[t]his seems to be reasonable defense strategy and this Court will not second guess it."

We agree with the post-conviction court and find that this issue is without merit. As previously stated, this Court will not second-guess a reasonably based trial strategy. *Adkins*, 911 S.W.2d at 347. Counsel's testimony at the post-conviction hearing established that it was a strategic decision not to introduce evidence about the jacket in light of the alibi defense being presented. She explained that because the defense was that Petitioner was never at the store committing the crime, it was not necessary to argue about whether he owned the jacked because regardless of ownership, he was not in the store at the time of the crime. Counsel also testified that during cross-examination at trial, she was able to elicit testimony that other individuals might possess such a jacket and that someone other than Petitioner could have been wearing such a jacket while committing the robbery. The post-conviction court correctly concluded that this was a reasonable trial strategy and we see nothing in the record which preponderates against the trial court's findings. Defendant is not entitled to relief on this issue.

In his next issue, Petitioner contends that counsel was ineffective for failing to call his mother at trial to bolster his alibi defense. At the post-conviction hearing, Petitioner's mother testified that she was unwilling to testify at Petitioner's trial because it was her belief that the "system" would work and the case would be resolved the way it should be. Had she been willing to testify, Ms. Matlock would have stated that Petitioner was staying at her home while she was away with her daughter, and that she asked Petitioner to stay in her home because it had previously been burglarized. She could not have testified that Petitioner was at her home at the time of the robbery, only that she had spoken to him on the phone that day. The post-conviction court found that the decision not to call Petitioner's mother as a witness was part of counsel's trial strategy. We agree with the post-conviction court. Even had counsel called Ms. Matlock to testify, Petitioner has not demonstrated that the outcome of the trial would have been different since Ms. Matlock could not testify as to his whereabouts at the time of the crime. Petitioner has failed to meet his burden of proof and is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE