## Estes v. Commonwealth.

(Decided May 4, 1929.)

618

BURNAM & GREENLEAF and FRED K. COPE for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

In the late afternoon of Sunday, May 6, 1928 (after it had become dark), the appellant and defendant below, David Estes, shot and killed A. J. Brookshire, who was at that time the sheriff of Estill county, Ky. The killing occurred in the front yard near to the porch of defendant's small residence located on an alley in the outskirts of Irvine, the county seat of the county. A regular term of the Estill circuit court was then in session, or convened the next morning, and on the latter day defendant was indicted, charged with murder, and two weeks thereafter he was tried and convicted; the jury fixing his punishment at death. His motion for a new trial was overruled, and on this appeal he urges three substantial grounds for a reversal of the judgment, which are: (1) The court erred in overruling his motion for a change of venue; (2) the admission of incompetent evidence, including misconduct of prosecuting counsel in his unwarranted efforts to introduce incompetent evidence; and (3) erroneous instructions, each of which will be considered and disposed of in the order named.

■ Appointed counsel represented defendant at his trial, and four days after the return of the indictment he filed a petition for a change of venue, with proper notice and supporting affidavits, as required by the statute giving the right, which is section 1109 of the 1922 edition of Carroll's Kentucky Statutes, the authority for the enactment of which is expressly given by section 11 (a part of its portion usually designated as the Bill of Rights) of our Constitution, but which right existed at common law independently of any constitutional or statutory creation. As stated in our opinion in the case of

Bradley v. Commonwealth, 204 Ky. 635, 265 S. W. 291, it was and is "bottomed upon the policy of the law that not only the defendant in a criminal prosecution, but the Commonwealth as well, should receive a fair trial at the hands of an unbiased and unprejudiced jury; and that if such a trial could not be obtained in the venue of the commission of the offense it should be removed to a place where it could be so obtained, all of which was pursuant to the underlying determination that justice should prevail in a court of justice, and that neither life, blood nor liberty shall be taken from the citizen except through a fair and impartial trial, nor should the Commonwealth be deprived of its right of just punishment except through such a trial."

It is furthermore pointed out in that opinion, and which is fortified by the citation of prior opinions of this court, that the burden is upon the applying defendant on such hearings to prove the grounds upon which he relies in support of the motion, and that the trial court is vested with a large discretion in determining the issue; but that the discretion is not an arbitrary one, and may be reviewed by this court, and, if found by it to have been abused, a reversal of the judgment will be ordered. We will not here insert those cases, since they may be found on pages 639 and 640 of the volume, supra (265 S. W. 293, 294), containing that opinion. The facts in each of them on the issue now under consideration were briefly referred to in the Bradley opinion, and the reasons for the diverse conclusions of the trial court in each of them were harmonized with the terms of the statute, supra, and so as to render them consistent with the foregoing purpose of the law as applicable to criminal prosecutions, and which analysis we will likewise omit from this opinion. It is sufficient to say that it was therein clearly shown that each case is to be determined largely from its individual facts and circumstances with a view of effectuating the purpose for which the right exists.

A case not referred to in that opinion is that of Browder v. Commonwealth, 136 Ky. 45, 123 S. W. 328, wherein the statements of the witnesses introduced upon the hearing of the motion literally considered, preponderated against its granting, but which this court determined were overcome by the proven and undisputed circumstances in the case, and which were held to speak louder and more convincingly than the mere opinion statements of witnesses, who themselves might be in-

fluenced the one way or the other because of the prevailing sentiment either for or against the defendant. In doing so we therein said: "In cases like this the court will not be concluded by the opinions of witnesses, but will look at the facts for itself; for it may happen that the strong feeling against the defendant in a county which prevents his having a fair trial may prevent him from obtaining witnesses to so testify on his motion for a change of venue," and which latter was made to appear in this case.

Other cases dealing with the question, as it relates to the duty of the trial court upon such hearings and to the authority of this court to interfere with its judgment, and not referred to in the Bradley opinion, are: Johnson v. Commonwealth, 82 Ky. 116, and Hutsell v. Commonwealth, 225 Ky. 492, 9 S. W. (2d) 132. The substance of such prior opinions is to the effect that, if the entire testimony in the case, as augmented by proven circumstances and conditions, establish with reasonable clearness that, because of a prevailing adverse prejudice against defendant, he could not obtain a fair or an impartial trial in the county where indicted and where the offense was committed, it then becomes the duty of the court to sustain the motion and to direct the trial to be had in some adjoining county where such prejudice did not prevail, or, if none such, then to the nearest county free from such prejudice.

With the law being in the condition as so briefly outlined, it becomes necessary to examine the substantial facts developed at and prior to the hearing of the motion in this case and to measure them by the declared principles of the law, supra, as so consistently announced by this court, and to then determine whether there was an abuse of discretion of the learned judge of the Estill circuit court in overruling defendant's motion. Before referring to the evidence, it might be well to remember that prejudice against a defendant on trial may be of different kinds and may produce different conclusions on the part of the members of the public among whom the prejudice prevails. By way of illustration, the prejudice may exist against the defendant personally, and may not touch his guilt or innocence of the particular accusation against him; or there might not be any prejudice against him personally, but, because of the enormity of the crime or the popularity of its victim,

the prejudice may take the form of a crystallization of sentiment relating exclusively to the *punishment* that should be inflicted upon the perpetrator of the crime whomsoever he might be, or it may produce the sentiment that the accused is not only the *guilty party*, but also that he should receive the maximum punishment provided by the law, and the latter seems to have been true in a number of the cases, supra, particularly the Johnson, Browder, and Bradley cases, and also in this one. In the Hutsell case, which is the latest one before this court, where the change of venue was denied by the trial court and approved by this one, there was no personal prejudice against the defendant, nor as to his guilt, but only as to the punishment that he should receive if he was guilty. The commonwealth therein overcame the prima facie showing made by the defendant, and we held that the trial court properly overruled the motion, and which was likewise true of a number of the other cases referred to.

We have already seen that the deceased, at the time he was killed, was the sheriff of Estill county, and was universally liked. He had been deputy sheriff of the county prior to his election as sheriff, and had not only formed many acquaintances in the county, but, be it said to his credit, he had made hordes of friends therein. He had a large family connection, as was also true with his wife, who belonged to a prominent family of that county, and the mere fact of his being slain, by whomsoever it was done, produced instant and universal indignation. Defendant was regarded as belonging to that class of law violators known as "bootleggers," and the local newspapers published accounts of the homicide with large and inflammatory headlines, in substance, that "The sheriff of the county had been murdered by a bootlegger." Immediately, and on the same night of the killing, angry and threatening crowds assembled, not only upon the scene, but upon the public streets of Irvine, and the members thereof freely gave vent to the expression that defendant should forfeit his life, which in effect, not only prejudged his *guilt* of the crime, but also prejudged the *death penalty* as a proper punishment for him. The circuit judge on the next morning entered an order upon the records of the court, the substance of which was that for the preservation of the peace of the community and the personal safety of

defendant he should be transferred and imprisoned in the jail at Lexington, Ky., where he would be free from the ravages of the threatened mob, and that the law could, at least in form, take its course.

When the motion for a change of venue was made, it was set for a hearing, and, when defendant was returned to the scene to be present thereat, three extra deputy sheriffs were sworn in and 25 guards appointed to protect him at the hearing of that motion, and the same precautionary measures prevailed throughout the trial of his case, which began on May 21, 1928, just two weeks from the time the indictment was returned and two weeks and one day, or, more appropriately, one night, after the commission of the murder with which defendant was charged. The three witnesses whose affidavits were filed in support of the motion (as the statute requires) positively stated the facts substantially as we have so briefly outlined them. The commonwealth filed about 30 stereotyped affidavits, each of which contained the same statements and differing only in the names of the affiants. In each of them it was, in substance, stated that the affiant was of the opinion that the sentiment in the county was that defendant could have a fair trial, and that in the opinion of the affiant such a trial could be had in Estill county. Defendant at the hearing of the motion cross-examined some of those affiants, and it was developed that the opinion expressed in the stereotyped affidavit was the individual one of the affiant, and that he had heard but a limited amount of discussion, the most of which was adverse to defendant, and revealed a dominating sentiment and prejudice against him, and that he should be punished *by death.*

In this case defendant did not deny the killing of the sheriff, but claimed that it was done in his necessary self-defense, and the court himself detected and correctly appraised the trying situation, and with commendable precaution provided means to protect defendant at the hearing of the motion for a change of venue as well as at his final trial, and which action on the part of the court is most convincing to us of the true state of adverse public sentiment and the prevailing prejudice against defendant.

Under somewhat similar circumstances, and under less convincing testimony, we determined in the Bradley

case that the court abused its dicretion in overruling the motion for a change of venue, and in doing so we said: "But clearly it was contemplated by both the framers of the Constitution in adopting section 11 thereof, and by the legislature in enacting section 1109 of the statutes, that prosecutions would arise and occur in counties where the prejudice against the defendant or the crime he committed was so great as to authorize a change of venue in order that justice might be done; or that the feeling against the deceased, or because of defendant's prominence or influence, or other facts, that the Commonwealth could not have a fair trial in the county; and a change of venue, at the instance of the Commonwealth or the defendant, was provided for; and the discretion of the court in ruling upon the motion is subject to review by this court within the limitations hereinbefore set out. It is seldom, if ever, the case that the evidence introduced in support of the motion by whichever side made is uncontradicted, since it is almost universally true that testimony opposing the motion is heard in some form. If, therefore, it is within our province to determine that the court's discretion was abused in cases where opposing evidence was heard, it seems to us that the proof and other facts and circumstances in this case furnish as strong grounds of an abuse of discretion as could be presented, unless we had a 'case where there was no testimony in opposition to the motion, but to which class of cases alone we are not confined in reviewing the ruling of the trial court."

We feel that but little, if anything, could be added to what was therein said, except to repeat what we have hereinbefore stated, that the showing made in this case in support of the motion was more convincing than was true in the Bradley case, where we reversed the judgment because of abuse of the discretion of the trial court in overruling it. The summoning of a jury from another county did not under the proven conditions cure the error, and which we expressly so held in the Bradley case, and also in the prior one of Shipp v. Commonwealth, 124 Ky. 643, 99 S. W. 945, 30 Ky. Law Rep. 904, 10 L. R. A. (N. S.) 335, and for the reasons distinctly pointed out in the Bradley opinion. We therefore conclude that this ground is meritorious, and should be, and it is, sustained.

624

■ In determining ground 2, it will be necessary to make a brief statement of the testimony touching the facts immediately connected with the killing. Defendant, as we have stated, resided in a small shack upon an alley running from a public street in the town of Irvine, his family consisting of himself, wife, two or three infant children, and a female relative of his wife, the relative being about 14 years of age and appears to have been partially feeble-minded. In the forenoon of the fatal day, defendant and his wife went to the country in the neighborhood where he had previously resided, the wife riding a horse and the defendant walking. They returned in the same fashion late that afternoon and just before the homicide, and, while traveling in the street from which the alley on which he resided led, and just before reaching that point, the deceased and William Durbin, who was chief of police of the town of Irvine, while riding in an automobile, overtook them. Across the saddle on the horse that the wife was riding was a pair of saddle pockets, and, when the overtaking occurred, the deceased spoke to defendant and called him by name. He then asked what was in the saddle pockets across his wife's saddle, and defendant answered, stating that it was "poke salad" and some other things that he obtained from the country. Deceased expressed some doubt as to the correctness of that answer, and asked permission to search the saddle pockets, when defendant inquired if he had a search warrant, to which deceased gave a negative answer; whereupon defendant refused to give his permission for the search. By that time the automobile had passed and gotten in front of defendant and his wife, and which was then at a point just before reaching the alley turning to defendant's residence. Deceased then told Durbin to go after a deputy sheriff and immediately return with him, and in the meantime he, deceased, would watch defendant until the deputy and Durbin returned, when they were to do the watching and the deceased would procure the search warrant. The latter and defendant, with his wife riding ahead, then pursued their travels to the alley and from thence up it to defendant's residence, and within a very short time three shots were heard, and within an equally short time thereafter the dead body of deceased was found in defendant's yard, with his feet within about two feet of the outer edge of

the porch, which was but little elevated from the ground, with his head extending outward and with three wounds in his body near the region of the heart.

No eyewitness testified to what occurred immediately at the time of the shooting, except defendant himself, though one witness living nearby testified to seeing the body of deceased lying on the ground after the first two shots. were fired, and then the third one was fired into his body, supposedly by defendant, but witness did not testify to that fact, since the one doing the shooting was out of her sight. There was testimony to show that the witness who so testified could not, because of obstructions, see the occurrences as so stated by her in her testimony, but there was counter testimony on the part of the commonwealth, and we are not now concerned with the truth or falsity of that evidence. Defendant testi-. fied to a state of facts which, if true, clearly sustained his right of self-defense, but his testimony and all of the other evidence introduced and heard upon the trial was a matter to be considered and determined by the jury under proper instructions from the court.

The testimony complained of under this ground consisted in (a) that given by a witness by the name of Denny, who was in defendant's house at the time of the shooting, and who claims that he went there about 2:30 p. m. on the fatal day while defendant was absent, and found in the kitchen a half pint of moonshine whisky that witness drank, and was therefore intoxicated when defendant returned and when the homicide occurred, and because of which he saw none of the shooting; (b) testimony extracted from defendant on cross-examination that on a prior occasion moonshine liquor had been found in his saddle pockets; and (c) efforts on the part of prosecuting counsel, over the objections and exceptions of defendant, to show that on the next day after the killing some one whose name was not mentioned found some moonshine liquor in a glass container in a gully not far from defendant's residence, but which effort was unsuccessful, though the persistency of the questioning with the permission of the court undoubtedly created a foul atmosphere in the case most prejudicial to defendant. Even if liquor had been so found, its relevancy in this case is hardly perceivable by us, and especially so in the absence of an utter failure to connect defendant with it.

We are clearly of the opinion that the matters complained of under subdivisions (b) and (c) were both incompetent and prejudicial, and upon another trial the court will eliminate them from the case. The testimony in subdivision (a) we have concluded was admissible for what it was worth as bearing upon the defendant's motive in perpetrating the homicide and as, at least remotely, contradicting his theory of self-defense, for if it were true that he left the whisky in his house when he and his wife went to the country on that day, it may have furnished a motive for killing the deceased to prevent the latter from discovering defendant's possession of it, and for that reason we have concluded that it was admissible, but only for the purpose indicated.

The court gave the usual instructions on murder, voluntary manslaughter, reasonable doubt, and self-defense, the latter being embodied in instruction No. 3; but it also gave to the jury instruction No. 4, and in instruction No. 1 it referred the jury to a definition of defendant's right of self-defense as embodied in instructions "Nos. 3 and 4," and which was correct as to instruction No. 3. Instruction No. 4 was an attempted definition of the rights and duties of the deceased as an officer in procuring search warrants and in exercising surveillance over suspected violators of the law while waiting for a search warrant, and his rights as an officer while so doing, and it then attempted to state the limitations on the rights of the defendant while the deceased was so engaged. In other words, it was an abstract attempt to define the relative rights of the parties as in cases of lawful arrests without evidence upon which it could be predicated, and which rights had already been defined, under the evidence adduced on the trial in the ordinary self-defense instruction No. 3 given by the court. There was no evidence that the deceased was attempting to arrest defendant under circumstances giving him the right to do so, nor was there any evidence to prove that defendant was resisting any such arrest at the time of the shooting. His only defense, and for which only was there any evidence to support, was that he shot and killed the deceased because the latter made demonstrations to draw his pitsol and to inflict upon defendant death or great bodily harm, and which facts, we repeat, were clearly and correctly submitted by instruction No. 3 which was the only one that

the court was authorized under the testimony to give upon that phase of the case. By the giving of instruction No. 4 the jury was authorized to infer that the court was under the impression that defendant had committed the homicide in resisting the performance of some official duty of the deceased, when there was no evidence to support it, and for that reason it was highly prejudicial to defendant's substantial rights and should not have been given.

Other less important minor errors are discussed in brief, but which will perhaps not occur upon a second trial, but, for the reasons stated, the judgment is reversed, with directions to grant the new trial and for proceedings consistent with this opinion.

Whole court sitting.