## Summers v. Commonwealth.

(Decided, December 12, 1930.)

500

BETHURUM & BIRD for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

Bradley Summers was indicted for the willful murder of George Spivey. On the trial of the case he was found guilty of manslaughter and his punishment fixed at five years' imprisonment. He appeals.

Tom Bryant, a witness for the commonwealth, stated these facts: He and Summers lived at Livingston and had worked together on the railroad. On the morning in question Summers asked him to go to Corbin with him in his car. They left Livingston about 9 o'clock, and at Corbin met a young man named Argenbright, and the three went to a drug store. Summers said he would like to have a drink of liquor. Bryant said, "I won't pay $5.00 a pint for whiskey." Summers said, "You can get chemicals for $3.00 a pint." They then bought the chemicals and drove out three or four miles and drank it. They then came back, got dinner, and then got some more chemicals and started back to Livingston. He and Summers drank some more of the liquor as they went along. About halfway to Livington they came to McWhorter's filling station. Bryant got out of the car, and Miss McWhorter got in the car with Summers. They took a ride together. When they came back, Bryant got in the car and they

started on to Livingston about 7 o'clock. When Summers was driving the car and when they had got about a mile and a half from Livingston, they saw George Spivey walking down the road twenty-five or thirty yards in front of them, with his back to them and on the left side of the road. Summers said, ''Watch me make him give me the road.'' He then came over to the left a little and something hit the windshield and broke it; some of the glass falling in the car and some on the road. The car ran on to the left side and broke a telegraph pole and turned over an embankment. Summers and Bryant were both thrown out. Bryant was not much hurt. He got up and signaled to a car that was coming along behind them and got the car to take him and Summers in to Livingston. Summers was pretty badly hurt. Shortly after they got to Livingston, the town marshal, hearing of the trouble, got a car and went out there, about 7:30 or a little later. He and the persons who were with him found Spivey at the foot of the embankment unconscious. He had received a severe blow on the back of the calf of the leg, also a severe blow on the back of the head, and his skull was fractured. He died that night. These witnesses testified that the weeds were mashed down northward south of Spivey's body, showing that his body had been thrown northward. They also testified that the broken glass they found in the wrecked car, which was still there, corresponded with the broken glass they found in the road some feet south of Spivey's body, and that they traced the tracks of the car from where it was found back to the right side of the road, a few yards south of where the broken glass was found in the road. Spivey lived in the neighborhood. Witnesses who knew his voice well testified that they heard him going along the road singing a few seconds before the car came along and recognized him by his voice, although it was dark. They also testified that they saw the car and that it was running very rapidly as it approached.

On the other hand, the defendant proved by Mr. Mc-Whorter and his daughter that he and Bryant were perfectly sober when they reached McWhorter's house and when they left it. Summers testified that he met a large car, which did not give him enough space and forced him off of the road until the wheels of his car were in the ditch on the side of the road, and that when he pulled back on the road his car swerved and he lost control of it and it ran across the road and struck the post and turned

over, seriously injuring him; that he did not see Spivey and knew nothing about his being hurt. He also showed that Bryant made an affidavit on the following day to the same effect and so testified before the grand jury a few days later, that after this Bryant was discharged from his position on the railroad where he worked under Summer's father, and after this he changed his testimony. Summers also introduced proof to the effect that the track of his car in the ditch at the side of the road was there the next day.

On the other hand, the commonwealth, in rebuttal, introduced three witnesses to prove that the track in the ditch on the side of the road the next day was made by the wrecking car which pulled Summers' car out. According to the proof for the commonwealth and the map in the record, Spivey's body was lying 187 feet south of the telegraph pole struck by the car.

Summers earnesly maintains that Bryant's evidence, in view of all the facts and his contrary statements, is insufficient to sustain the conviction. He proved by five witnesses that Bryant was a man of bad moral character. He also insists that there were errors in the proceeding. One of these is this: At the conclusion of the evidence on both sides, before giving the instructions to the jury, and while there was a recess in the trial of the case, the judge of the court called two other felony cases for trial. Both sides announced ready for trial, whereupon the jury was impaneled to try the first of these cases, which was an indictment against Edward Price and Virgil Evans for breaking into a warehouse with intent to steal therefrom, and three members of the jury trying Summers were used on the trial of this case and separated from the remainder of the Summers jury while the jury was out in the jury room. After that case was finished the court proceeded to try Jim McDaniel and Robert Powell, charged with breaking into a railroad car with intent to steal therefrom, and in the trial of that case the entire Summers' jury was used and served. They found those defendants guilty and fixed their punishment at confinement in the state penitentiary for three years. The defendant objected to any of the jury in his case being used in the trial of the other two cases. The court overruled the objection, and the defendant excepted. The defendant thereupon moved the court to discharge the jury and continue this case until the next term of the

court. The court overruled the motion, and the defendant excepted.

Section 244 of the Criminal Code of Practice is in these words:

"On the trial of offenses which are or may be punished capitally or by life imprisonment the jurors after they are accepted, if all of same sex, shall not be permitted to separate, but shall be kept together, in charge of the proper officers. But if the jury consists of both male and female, then the sexes of such jury may be permitted to separate during the trial and when necessary after final submission of the case, each sex being kept together in charge of an officer of like sex, as if two separate juries. On the trial of other felonies the jurors before the case is submitted to them, may be permitted to separate, in the discretion of the court, but after the case is submitted they shall be kept together in charge of officers. On the trial of misdemeanors the jurors may be permitted to separate, or the court may order them to be kept together."

The well-settled rule under this provision is thus stated in Roberson's New Kentucky Criminal Law and Procedure, sec. 1972; "In all cases of separation it must be clearly shown by the state that no opportunity has been afforded for the exercise of improper influences on the jurors."

Here the commonwealth offered no evidence to show that the violation of the statute was not prejudicial to the defendant or that no opportunity was offered to persons to talk with the jury; but it is earnestly insisted that, as the defendant was found guilty only of manslaughter, he cannot complain of the separation of the jury. This precise question was presented in Campbell v. Com., 162 Ky. 106, 172 S. W. 110, where, as here, the defendant was indicted for murder and found guilty of voluntary manslaughter, and the judgment was reversed solely for this reason. That opinion rests on and follows the language of the statute, which requires that the jury shall be kept together in charge of the proper officers "on the trial of offenses which are or may be punished capitally or by life imprisonment." The defendant was on trial for an offense which may be punished capitally or by life imprisonment. It necessarily follows that a new trial must be granted.

504

On the trial of the case this occurred on the cross-examination of Tom Bryant:

"Q. I will ask you to examine the minutes of the hearing of this case before the grand jury, as made by the official stenographic reporter, and say whether or not the questions and answers made to such questions were as indicated by the minutes which I now hand you, actually made by you? (Objection by attorney for commonwealth. Objection sustained, to which ruling of the court the defendant objected and excepted at the time and avowed that if said witness were permitted to answer he would truthfully state that said questions as shown in said minutes were put to him and he made the answers to said questions as shown by said minutes; which minutes so taken by said stenographer are in words and figures as follows)."

By section 110 of the Criminal Code of Practice a stenographer may be appointed to take down the testimony of witnesses before the grand jury. The transcript of the testimony "may be introduced and used in court as competent and legal evidence for the purpose of contradicting any witness whose testimony was taken upon said hearing before said grand jury." Under this provision the defendant's counsel, fixing time and place, may on the cross-examination of Tom Bryant, read to him any question and answer in the stenographer's transcript, and, if he denies making the answer before the grand jury, he may be contradicted as a witness by proof that he did make the answer as recorded in the transcript. But counsel should not simply hand to the witness the copy of the transcript and ask the witness to read it and say if he gave that testimony. The cross-examination should be confined to questions and answers inconsistent with his testimony on the trial on which the counsel expects to contradict the witness. The evidence is only competent to lay the foundation for the contradiction of the witness and should go no farther

The court properly permitted Sam Wagoner, W. M. Bales, and Asa Mink to testify in rebuttal that the track in the ditch on the side of the road was made by the wrecking car which pulled the other car out. The defendant had proved that this track was there the next day, and it was competent for the commonwealth to show when and how this track was made.

As the judgment must be reversed for the reason above given, it is unnecessary for the court to pass on the objection that the verdict is not warranted by the evidence.

Judgment reversed, and cause remanded for a new trial and further proceedings consistent herewith.

The whole court sitting.