## Patterson v. Commonwealth.

(Decided Dec. 11, 1934.)

N. R. PATTERSON, E. H. JOHNSON, J. S. FORESTER, R. L. POPE, H. H. OWENS and J. H. TAYLOR for appellant.

BAILEY P. WOOTTON, Attorney General, DAVID C. WALLS, Assistant Attorney General, GOLDEN, LAY & GOLDEN, D. B. SMITH and WALTER B. SMITH for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

About midnight of November 25, 1933, a charge of dynamite was exploded under the corner of the house of M. S. Parrott, in Pineville, and did considerable damage. Its effect was apparently aimed for Lawrence Dwyer, an organizer for a miners' labor union, who was boarding there, and who suffered some bodily injury. The appellant, Chris Patterson, was an organizer for a hostile union. For some time there had been serious and tragic labor troubles in Bell and Harlan counties, as is reflected in several of our opinions. The appellant was indicted with five others charged with having confederated and banded together and gone forth for the purpose of injuring, molesting, and destroying the property of another, and that the explosion and conse-

quent damage to the property resulted from that statutory conspiracy. Section 1241a-3, Ky. Stats. Upon a separate trial Patterson was convicted and given a penalty of ten years in the penitentiary.

The evidence of the commonwealth in substance was that a few days before the occurrence the accused brought a quantity of dynamite in a brown or yellow paper sack, or "poke," as the witnesses called it, and also some caps and a long fuse, to the home of Mary Thomas, a close neighbor in Harlan. He had been taking his meals there and she was keeping his two young children. His statements and attitude in relation to the explosives showed he had them for an evil purpose. Late in the afternoon preceding the dynamiting of Parrott's boarding house, Patterson had Ben Thomas and his wife drive him to Pineville. He then had a brown "poke" in one pocket and a roll of something in another, which was apparently the fuse. They took him to Pineville and to the home of Larkin Baker, one of the accused conspirators, who had been in Harlan that day talking with Patterson. All those indicted except Baker lived in Harlan. After an hour or so Patterson and Baker came out of the house and got in another automobile and gave directions to Thomas to follow them. The two men went up an alley by Parrott's property where there was a third man who was not recognized. After awhile they came out and Patterson got in Thomas's car and told him: "Get me out of here quick. I like to have got killed in there with dynamite. That makes twice they like to have got me." A similar explosion had taken place in September under Parrott's garage close to the house. Thomas got back to Harlan with Patterson about 9 o'clock. About 11 o'clock, when Thomas refused to return with him to Pineville, Patterson got Bascom Burgin to take him back there to get an important letter, as he said. According to Burgin, he went again to Baker's home and obtained a letter or paper, and upon their return to Harlan he put it in the mail box of John Surgenor, who Patterson called and told there was some important news in the letter and that no one else was to see it. This was about 2 o'clock or later in the morning. There was much other evidence of statements and acts of the defendant both before and afterward tending to prove his connection with the crime. Some of it implies that it was instigated by "big men," as he expressed it. His defense was a denial and evidence by a number of witnesses that he was sick.

in bed that day and night at his home in Harlan. The evidence throughout ·is directly contradictory and impossible of reconcilement. Its recitation in more detail is not necessary.

There is really no argument that the letter of the evidence is not sufficient to sustain the verdict. The attack is centered upon the quality of testimony. Practically all the evidence against the accused was given by Mary Thomas and members of her family and their connections, all of whom were impeached by proof of bad reputations. She admitted having remained silent about what she knew until early in January when she fell out with Patterson because, as she said, he had taken her daughter away. She had caused· his arrest in an effort to have him put under bond to keep the peace. About that time she got in contact with John Gross, who took her before Dwyer and the officers, with the charge of conspiracy resulting. There was evidence that the Thomas woman stated she had got money out of it and had suggested to several men that they also could get money for testifying for the prosecution. It must be admitted that the character of the witnesses and some gross inconsistencies in their testimony were calculated to cast doubt upon their stories. But they were the defendant's associates. The jury saw and heard them and thereupon believed them, their impeachment and the voluminous evidence of the defendant and his witnesses to the contrary notwithstanding. Cf. Crenshaw v. Commonwealth, 227 Ky. 223, 12 S. W. (2d) 336.

The defendant filed a petition for a change of venue upon the ground that he could not have a fair trial in the county because of the strife and antagonism between the coal operators and laborers and the presence of a large number of members of the labor union of which Dwyer was an officer. After a hearing the petition was denied. A jury was chosen from Knox county under circumstances shown by an order of court, the essential parts of which may be thus summarized: More than half a day was spent in an effort to obtain a jury from the regular panel. There were eight men who had been passed by both parties, but three or four of them had admitted some little knowledge concerning the matter on trial and there were only four or five of the regular panel left for examination. It was apparent that a jury could not be selected from them. To have gone to the

wheel would have required time, and the court's experience in picking up bystanders had been very unfortunate. In view of these things and the evidence and arguments advanced in support of the motion for a change of venue, and in order to remove any question about the jury being free from bias, the court dismissed those tentatively chosen and directed that a venire be summoned from Knox county, adjoining, where there was practically no mining business, except that part of the county lying next to Bell, and where perhaps 90 per cent. of the citizens were engaged in farming and other lines of business not influenced by the mining business. The defendant objected to this action of the court, particularly to obtaining a jury from Knox county. It was stated in an affidavit that the trial judge, commonwealth's attorney, county attorney, and one of the chief prosecuting witnesses, Parrott, and two of three members of a firm of lawyers employed to assist in the prosecution, were natives of Knox county and the third member still resided there.

Since the amendment of section 281, Criminal Code of Practice, by chapter 63, Acts of the 1932 General Assembly, the entire matter has become subject to review on appeal. Alsept v. Commonwealth, 245 Ky. 741, 54 S. W. (2d) 337. It is fundamental as well as statutory that these matters of decision are peculiarly within the discretion of the trial judge. Section 193, Cr. Code Prac.; section 1109, Ky. Stats. The action of the court upon the motion for the change of venue and in summoning a venire from Knox county from which the jury was selected are to be considered together in determining the argued question of prejudicial error.

While the selection of the jury from another county will not in every case be a sufficient substitute for granting a change of venue because of unusual circumstances, that action is ordinarily sufficient to protect the defendant's rights. Estes v. Commonwealth, 229 Ky. 617, 17 S. W. (2d) 757; Miller v. Commonwealth, 248 Ky. 717, 59 S. W. (2d) 969. The discretion vested in the trial judge in respect to summoning jurors from adjoining county is curbed by the statute only by the restriction that he shall first have made a fair effort in good faith to satisfy himself that it will be impracticable to obtain a jury free from bias in the local county. Of course, he should not go to a county where similar conditions exist. The record manifests such an effort was made

and overwhelmingly discloses not only that the action was proper but probability that failure to have gotten a jury out of Bell county would have been error. Section 194, Cr. Code Prac.; Daniel v. Commonwealth, 154 Ky. 601, 157 S. W. 1127; Deaton v. Commonwealth, 157 Ky. 308, 163 S. W. 204; McHargue v. Commonwealth, 239 Ky. 23, 38 S. W. (2d) 927; Taylor v. Commonwealth, 240 Ky. 450, 42 S. W. (2d) 689; Benson v. Commonwealth, 249 Ky. 328, 60 S. W. (2d) 941. The case of Greer v. Commonwealth, 164 Ky. 396, 175 S. W. 665, is peculiarly in point. There was a petition for a change of venue, and after a hearing on that application the court tested and exhausted the regular panel and then a panel of bystanders summoned for jury service. An order was entered reciting that because of the publicity which had attended the homicide, the court was of the opinion that a jury could not be secured in the county and directed that a jury be obtained from an adjoining county. As here, the defendant objected to the county because it was the home of the prosecuting attorney and the former home of the chief witness for the commonwealth. As here, there was no proof that the state of public sentiment in that county was such that the defendant could not obtain a fair trial herein, or by a jury selected therefrom, and it was held that the objection was not well taken. The fact of former or even present residence in a county of the officers of the court, including lawyers, has never been regarded, so far as we are aware, as conclusive evidence that a fair jury cannot be had in that county. One of the defendant's lawyers was also a former resident of that county, and another was then living there. We perceive no error in the action of the court in these rulings.

The defendant sought a continuance upon the ground of absent witnesses and the fact that one of his counsel had been previously employed in a case to be tried in another county before this trial could be completed. Special bailiffs appointed by the court brought in most of the absent witnesses, and the defendant had the benefit of the testimony of those not appearing as it was recited in his affidavit for a continuance. Somehow the attorney managed to be present to function with the battalion of six lawyers for the defense. We need not pass upon the merits of the claim for a continuance as it was presented, for the anticipated prejudicial error or refusal did not materialize.

The ground of reversal urged with the most vigor is that the defendant was not accorded a fair trial because of restrictions upon cross-examination of one or more witnesses, which counsel construe as an abridgment of a constitutional right to confront the witnesses. The court seems to have been liberal enough in this matter. We note some of the specific claims of error in this particular. After a number of questions were asked Mary Thomas in trying to exact admissions of prejudice and of having been paid or promised payment for her accusations and testimony, she was asked, without specification of person or place, if she had not said that John Gross had offered her $700 to be divided among the witnesses for testifying against the defendants. Objection being sustained, another question was asked out of the hearing of the jury if Gross had not on a certain Sunday in her presence offered her son-in-law money to testify. The witness answered by way of avowal that he had not. Counsel complain of this and say that the court threatened him with jail if he repeated such questions. There is nothing in the record about any such threat, but the gross impropriety of the question is manifest. Objections were sustained to somewhat similar interrogation of this and other witnesses. However, we think the jury became fully aware of the claim of the defendant that most of the Thomas clan had been thus corruptly influenced, for it was gotten before the jury in many ways and through other witnesses by questions and answers which were admitted.

The court properly sustained objections to some general questions as to what a witness had testified before the grand jury and on examining trial which was contradictory of her present testimony. It was suggested at the time that the record was the best evidence. Where a witness has previously given testimony and the record is available, it is always better to ask him whether or not specific questions and answers were asked and given. Section 110, Cr. Code Prac.; Owens v. Commonwealth, 181 Ky. 378, 205 S. W. 398; Summers v. Commonwealth, 236 Ky. 499, 33 S. W. (2d) 594.

R. C. Tackett, charged in the indictment as one of the conspirators, was asked if two or three days before the explosion he didn't tell Luke Helton at his home that he had a little job to do over at Pineville and wanted to borrow some meal, and that if he didn't tell Helton soon after it occurred that he had done it and

show him a handful of money. Upon his denial, Helton testified that Tackett had done so. The court admonished the jury that Helton's evidence was for the purpose of contradicting the witness, if in its judgment it did contradict him, and that is was admitted for no other purpose and should not be taken as substantive evidence of the guilt or innocence of the defendant on trial. The appellant invokes the familiar rule that evidence of acts and statements of an alleged coconspirator made after the consummation of the object of the conspiracy are not admissible. The rule is not applicable. The alleged coconspirator was here in the role of a witness and in testifying in behalf of the defendant on trial he exculpated himself from the charge. The evidence was competent therefore under the rule pertaining to the contradiction of witnesses, even though the transaction or connected statements involved a lapping over beyond the time of the explosions. The admonition conserved the defendant's rights. Sections 597, 598, Civil Code of Practice, which are applicable to the criminal practice.

During the course of almost every trial, particularly of one of this character, length, and intensity, errors are almost certain to occur. There are perhaps a few here, but a careful reading of the record convinces us that no substantial error was made in the admission or rejection of evidence.

Some technical criticisms are offered of the indictment and of the instructions. Lacking any degree of merit, we do not discuss them.

We have given heed not only to the numerous specified claimed errors, but also the general blanket criticisms of the conduct of the trial, of the vigorous assertions of unfairness, and of the defendant's innocence. Nevertheless, we are of opinion the defendant received a fair trial. It was, of course, for the jury to weigh the evidence for the prosecution and consider the credibility of the witnesses. They chose to accept this evidence and to reject the defendant's plea of innocence.

The judgment is affirmed.